# CHARLESTON.

L. H. TALBOTT v. PAYNE, DIRECTOR GENERAL OF RAILROADS.

Submitted February 7, 1922.    Decided February 14, 1922.

1. CARRIERS—*Not Insurers of Live Stock; Not Liable for Injuries Arising from Inherent Nature or Propensities of Animals.*

   A carrier is not an insurer of live stock delivered to it for transportation as in the case of inanimate property. For injuries to such live stock shipments arising from the inherent nature or propensities of the animals the carrier is not liable.    (p. 282).

2. SAME—*Live Stock—Death of in Transit When Properly Loaded and Moved Attributed to Inherent Nature or Propensities of Animals.*

   Where it is shown that a shipment of live stock was in good condition when delivered to a carrier; that the car was not improperly loaded, where the loading was done by the shipper; that the car was promptly and expeditiously moved from the initial point to destination without any accident to the train carrying the same; and that no injury could have occurred to such stock from negligence in the transportation thereof, notwithstanding which it is found that some of the stock are dead upon arrival at destination, such result will be attributed to the inherent nature or propensities of the animals, and not to the negligence of the carrier. (p. 282).

3. SAME—*Interstate    Shipment—Loss—Suit—Time    for    Filing Claim.*

   A shipper is not barred from maintaining a suit against the carrier to recover for a loss to an interstate shipment of live stock occasioned by the carrier's negligence, because he did not file his claim with the carrier within four months, as provided by the live stock contract, the Federal Interstate Commerce Act providing that no such notice shall be required in such case as a condition precedent to recovery. (p. 287).

Error to Circuit Court, Greenbrier County.

Action by L. H. Talbott against J. B. Payne, Director General of Railroads, Agent. Judgment for plaintiff and defendant brings error.

*Reversed and remanded.*

*Fitzpatrick, Campbell, Brown & Davis,* for plaintiff in error.

*R. L. Clark,* for defendant in error.

RITZ, JUDGE:

The defendant, the Director General of Railroads, by this writ of error seeks reversal of a judgment against him for the value of certain live stock which, it is claimed by the plaintiff, died while being transported over the Chesapeake and Ohio Railroad as a result of the negligence and carelessness of the carrier.

About the first of October, 1919, the plaintiff ordered a stock car for a shipment of hogs from Ft. Spring, West Virginia, to Baltimore, Maryland. Pursuant to this order the defendant placed a car upon the tracks at Ft. Spring. The hogs for shipment were gathered by the plaintiff from various parts of Monroe county, being driven to the point of shipment from these points, ranging in distance from six to thirty miles therefrom. They reached Ft. Spring and were placed in the pens about noon on the 2nd day of October, where they were watered and fed, and were, according to the testimony of the parties who drove the hogs in, being the plaintiff's son and another man hired for the purpose, in good condition. Later in the evening, the exact time not appearing, they were loaded into the car, and at 9:20 picked up by an eastbound freight train. The shipment reached Clifton Forge at 4:30 on the morning of October 3d. It remained there until 6:30 on that morning when it continued its journey east, arriving at Charlottesville at 3:25 P. M. on October 3d· It seems that the train containing this shipment moved out of Charlottesville five minutes after it reached that station, to-wit, at 3:30 P. M.

on October 3d, and arrived at Potomac Yards at 9:05 P. M. of that day, covering the whole distance from Ft. Spring to Potomac Yards, more than 300 miles, in a little less than 24 hours. At Potomac Yards the car was cut out for the purpose of feeding, watering and resting the animals. It was discovered upon unloading the car that 21 of the hogs therein were dead. The remaining 88 were fed, watered and rested, and sent forward on the next morning to their destination at Baltimore, where they arrived in good condition, as testified to by the party receiving them, and where they were sold without depreciation in the price on account of their condition. It is for the value of these 21 hogs that died between Ft. Spring and Potomac Yards that recovery is sought in this suit. The plaintiff testifies that the hogs were worth $25.00 apiece, or a total of $525.00. There was no other direct evidence as to their value. The jury found a verdict for $175.00, and upon this verdict the court rendered judgment.

There is no substantial conflict between counsel as to the liability of a common carrier of live stock. It seems to be very well established that the general rule making a carrier absolutely liable for the loss of goods entrusted to it for transportation, unless such loss occurs from the act of God or the public enemy, is qualified when applied to live stock, and made subject to the further exception that it is not an insurer against injury resulting from the inherent nature or propensities of the animals, and without fault of the carrier. And this rule in this case is still further modified by the fact that the shipment was loaded by the plaintiff, or his agent, and because thereof, under a condition in the bill of lading authorized by the Act of Congress regulating interstate commerce, the shipper is liable for any injury resulting from negligence in loading the car.

The plaintiff introduced the two men who drove the hogs into Ft. Spring, who testified that they were in good condition when placed in the pens for loading. These witnesses also testify that the number of hogs with which they started was 114; that one died on the way, and that they

reached Ft. Spring with 109.  They do not account for the other four.  They further state that a car of the size of the one in which these hogs were loaded could easily contain the number loaded in it.  In fact, their testimony is that such a car could comfortably contain from 120 to 125 of such hogs.  The party who loaded the hogs for the plaintiff likewise testifies that they were in good condition when loaded, and that the car was not crowded; that it was of sufficient size to contain from  120 to 125 hogs of the size of the ones loaded therein.  The commission merchant in Baltimore who received the hogs testified that the 88 received by him were in good condition when received, and that the car in which they were shipped was of sufficient size to comfortably haul from 120 to 125 hogs of that size. On this showing the plaintiff contended that it was incumbent upon the defendant to account for the death of these hogs from some cause for which he was not responsible, and this he undertook to do.  He showed by the three conductors who had charge of the trains that carried the hogs from Ft. Spring to Potomac Yards the movement of these trains, as above indicated.  Each of these conductors testified from their records of the trip made by them at the time, showing when the shipment left Ft. Spring, when it reached Clifton Forge, and when it left Clifton Forge and reached Charlottesville, and left that point and its arrival at Potomac Yards.  In addition to this showing, it is proven that the trip made was an exceptionally good one, the time consumed being less than is ordinarily consumed by live stock shipments.  It is shown further by each of these conductors that there was no rough handling of the train, nor any. accident of any kind which could have caused the injury to the animals.  The conductor who moved the car from Ft. Spring states that when he picked it up the hogs were restless and were squealing, and that he called the attention of the agent to this fact at the time, and that it was his belief that they were over crowded in the car; that while the shipment was made on the 2nd of October, the weather was unusually warm for that time of the year, the thermometer reaching 94° at Charlottesville, Virginia, on the 3d of October,

the day on which the hogs passed through that place. The conductor who took the shipment from Clifton Forge to Charlottesville, testifies that there was no accident to his train between Clifton Forge and Charlottesville, nor any unusual handling of it that could have caused any injury to the animals. It appears from the testimony of one of the conductors that when the hogs reached Charlottesville some of them were then dead, and that they were extremely restless, were attempting to break out of the car, and were fighting and squealing at that time. The conductor who took the train from Charlottesville to Potomac Yards made an exceptionally quick trip, covering the 110 miles in less than six hours. He testifies that his train only made two stops between Charlottesville and Potomac Yards; that there was no rough handling of it, and no accidents happened to it. All three of these conductors observed this car of hogs while in the train in their charge, and all swear that the hogs were at various times fighting and squealing, and that in their opinion the car was overloaded, there not being sufficient space therein for the hogs to be carried in comfort. The man in charge of the stock yards at Potomas Yards who unloaded the hogs states that the death of the 21 hogs was evidently due to the fact that too many hogs were placed in the car. He has had many years experience in handling live stock, and is very confident that this car was badly overloaded. It is further testified by one of the witnesses for the plaintiff that hogs raised out in the fields will stand being driven or shipped very much better than hogs raised in pens, but it is not shown how many of these hogs were raised in pens and how many were raised out in the fields.

The court instructed the jury that the defendant would not be liable for the loss of the hogs if they believed that such loss was caused by the car being overloaded, or if they believed that the hogs died as a result of their inherent nature or propensities and without fault of the carrier. By its verdict the jury has answered both of these questions in the negative, that is, it has found that the car was not overloaded, and it has also found that the hogs did not die as the result of any inherent propensities or weaknesses

which they possessed as animals, but from the negligence and carelessness of the defendant in handling them. The defendant insists that this finding cannot be sustained by the evidence.

As before stated, it seems to be well established that the measure of liability of a carrier of live stock is a little different from that of a carrier of dead freight. In the case of dead freight, there is nothing inherent in the nature thereof against which the carrier cannot protect himself. He can safely secure the boxes or packages in which the same is contained against interference, either from the freight itself, or from any other cause, except the act of God or the public enemy. In the case of live stock such is not the case. He can, of course, handle them with all of the care which is required in the case of handling any other freight, but because of the fact that the animals have the power of locomotion and action he is not in a position to secure them against injury from each other; and, further, because of the fact that their value depends upon their being alive at the point of destination he is unable to prevent their death from causes due to their natural propensities. This doctrine is well recognized by the authorities. *Maslin* v. *R. R. Co.*, 14 W. Va. 180; 4 R. C. L., title ''Carriers'' § 421; 10 C. J., p. 123. Recognizing this to be the law, does the evidence in this case justify the finding that the death of the 21 hogs was due to the negligence of the defendant? The evidence is clear, postive and distinct that no act was done or duty omitted by the defendant, or any of his agents, which could have resulted in injury to the animals. There is no attempt made upon the part of the plaintiff to show that such was the case, but negligence is sought to be implied from the fact alone that the hogs were dead when they reached Potomac Yards. Assuming, as the jury has found, that the car was not overloaded, and that the hogs were in good condition when placed in the car, and taking as true that the carrier handled the shipment with all reasonable dispatch, and with all reasonable care, and we must take this as true because it is proven beyond question, and the time consumed in making the trip fully corroborates the

evidence of the witnesses, then is there a presumption that the hogs died from some negligent act; or, rather, under such circumstances, would not the presumption be that the death of the hogs came from some cause for which neither of the parties might be responsible. In other words, should it not be attributed to the natural propensities of such animals when taken from the surroundings in which they had been raised, and placed on board a railroad car to be transported a long distance under circumstances to which they were entirely unaccustomed? In the case of *Schaeffer* v. *R. R. Co.*, 168 Pa. St. 209, 47 Am. St. Rep. 884, it was held that where it is shown that the carrier has used all reasonable care in the transportation of the animals, and their death cannot be accounted for upon any satisfactory grounds, it will not be presumed that the same arose from the negligence of the carrier; and in *Lewis* v. *R. R. Co.*, 70 N. J. L. 132, 1 Am. & Eng. Anno. Cases 156, it is held that where the injuries received by the live stock are such that they are as likely to have been caused by the nature of the animals as by the negligence of the carrier, the court cannot assume, in the absence of evidence, that the injuries were due to the latter cause. There is a note to this case as the same is reported in the Selected Case Series cited in which it is stated that upon proof that the carrier performed the duty incumbent upon it, the loss or injury to live stock is presumed to have been due to the natural propensities of the animals, and not to the negligence of the carriers, which is supported by elaborate citation of the authorities. If no explanation of the handling of this shipment had been made by the carrier we think undoubtedly, under the showing made by the plaintiff, the jury might very well attribute the loss of the hogs to the carrier's negligence. This presumption, however, is removed by the proof of proper handling of the shipment from the initial point to the point of destination. In such a case, where the evidence fails to attribute the death of the animals to any particular cause, and it is shown that the carrier has fully discharged its duty, we must presume that their death was occasioned by the natural propensities of the animals. Of course, it is well

known that such animals are much more likely to die when being transported in stock cars than while being kept in pens or fields to which they have been accustomed. Death may overtake such animals even when kept in the pens or fields where they are ordinarily raised without negligence upon the part of those charged with their custody, and this likelihood is much increased when they are taken from the mode of living to which they are accustomed and submitted to one imposing upon them a very much severer strain for a long space of time. We are of opinion that when a case like this is presented in which the evidence clearly shows that the carrier has been guilty of no default in the performance of his duty, and it is doubtful whether the plaintiff was not himself in default, although the jury has found that he was not, the death of the animals in transit must be attributed to the natural propensities of such animals.

There is another question raised by the defendant which it is contended bars recovery, and that is that no notice of claim was given to the defendant by the plaintiff within four months from the loss of the animals, as required by a provision in the bill of lading. This contention is met by the first section of the Bills of Lading Act, being § 7976 of Barnes' Federal Code, wherein it is provided: "That if the loss, damage, or injury complained of was due to delay or damage while being loaded or unloaded, or damaged in transit by carelessness or negligence, then no notice of claim nor filing of claim shall be required as a condition precedent to recovery." This was an interstate shipment, and is controlled by the Federal Interstate Commerce Act, and it is unnecessary under that act to give the notice or make the claim within 4 months, as contended for by the defendant.

Our conclusion is to reverse the judgment, set aside the verdict of the jury, and remand the case for a new trial.

*Reversed and remanded.*